UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
CIVIL ACTION NO: 4:10-CV-00005-M
(ELECTRONICALLY FILED)

AUTO-OWNERS INSURANCE COMPANY                                       PLAINTIFF

V.     **MEMORANDUM IN SUPPORT OF PLAINTIFF'S
       MOTION FOR SUMMARY JUDGMENT**

ROY VARBLE, ET AL.                                                  DEFENDANTS

\* \* \* \* \*

### INTRODUCTION

This matter arises from an automobile accident that occurred in Zavala County, Texas on January 7, 2009. Defendant, Roy Varble,[1] was a passenger in a 2003 Ford Ranger owned by his adult step-son, Randall Sands, and operated by his wife, Phyllis Varble. At the time the accident occurred Roy Varble and Phyllis Varble had an Automobile Policy (the "Policy") through Plaintiff, and movant herein, Auto-Owners.

Auto-Owners filed the instant Declaratory Judgment action seeking a declaration that its Automobile Policy does not provide uninsured motorist coverage or underinsured motorist coverage to Roy Varble for injuries sustained in the January 7, 2009, automobile accident. Auto-Owners now submits this Memorandum in Support of its Motion for Summary Judgment, seeking a declaration by this Honorable Court that it owes no uninsured or underinsured motorist coverage to Roy Varble.

---

[1] Defendant Roy Varble's full name was Roy Edward Varble, Jr. and he was often referred to as "Ed Varble." For the purposes of the instant Motion, Defendant will be referred to as "Roy Varble" to avoid confusion with his son and guardian, Edward H. Varble.

# FACTS

The following facts are undisputed admissions, gleaned from the pleadings and from the deposition of Randall Sands, the owner of the vehicle operated by Phyllis Varble on the date of the accident.

### A. Vehicle Usage and Ownership on the Day of the Accident

On January 7, 2009, Phyllis Varble was the owner of a 2007 Chevrolet Uplander, which was insured through Auto-Owners, via the Policy at issue. (Sands dep., p. 14; Complaint, ¶26 and Exhibit A; Answer of Roy Varble, ¶10.)  No other vehicles were scheduled on the Policy. (Complaint, Exhibit A.)  The named insureds on the Policy were Phyllis Varble and Roy Varble, her husband.  (Complaint, ¶21; Answer of Roy Varble, ¶10.)

At the same time, Randall Sands (Phyllis Varble's son and Roy Varble's stepson) owned, solely in his name, a 2003 Ford Ranger, which he insured through Progressive Insurance.  (Sands dep., pp. 10-11, 12, 13, and Exhibit A; Complaint, ¶16; Answer of Roy Varble, ¶5.)  The 2003 Ford Ranger was not a scheduled automobile on the Auto-Owner's Policy. (Complaint, ¶27 and Exhibit A.)

On the day of the accident, Phyllis Varble, Roy Varble, Randall Sands, and Nellie Carraway (Phyllis Varble's sister) were traveling from Salt Lake City, Utah to Ajijic, Mexico.  (Sands dep., p. 6, 16, 19.)  Phyllis Varble was driving the 2003 Ford Ranger owned by Randall Sands.  (Sands dep., p. 17; Complaint, ¶7; Answer of Roy Varble, ¶5.)  Roy Varble was a passenger in the 2003 Ford Ranger driven by Phyllis Varble.  (Sands dep., p. 19; Complaint, ¶9; Answer of Roy Varble, ¶5.)  Phyllis Varble drove the Ford Ranger because it was easier for her to handle than both the Chevrolet Uplander and the rental moving truck transporting the family's belongings.  (Sands dep., pp. 18-19.)

2

It was not unusual for Phyllis Varble to drive Randall Sands' Ford Ranger. In fact, Phyllis Varble had originally been the co-owner of the Ford Ranger, only transferring it fully to Randall Sands on April 8, 2008, less than one year before the accident. (Sands dep., p. 11 and Exhibit A.) Phyllis Varble operated the Ford Ranger on occasion. (Sands dep., p. 14.) Moreover, Mr. Sands had no problem with Phyllis Varble, his mother, using the Ford Ranger whenever she wanted or needed to do so. (Sands dep., pp. 6, 15, 16.) She did not need permission to do so. (Sands dep., p. 15.)

**B.** **Residence of Randall Sands and Phyllis Varble on the Day of the Accident**.

From approximately 2005 to 2008, Phyllis Varble, Roy Varble, Randall Sands, and Nellie Carraway lived together at 2613 South Cherokee, Owensboro, Kentucky. (Sands dep., p. 5.) Approximately six to seven months before the accident, Phyllis Varble, Roy Varble, Randall Sands, and Nellie Carraway moved to 67 Paddock Street, Montgomery, Illinois, where they resided together in the same house. (Sands dep., pp. 7-8.)

According to Randall Sands, the South Cherokee and Paddock Street properties were where he slept and where he received his mail. (Sands dep., p. 9.) In fact, he was one of the owners of each property, which he "shared" with his family—each owning one-third. (Sands dep., pp. 9, 25, 28.)

Phyllis Varble, Roy Varble, Randall Sands, and Nellie Carraway eventually decided to head to Mexico; however, they first stopped in Salt Lake City, Utah because Randall Sands wanted to look at property in that area. (Sands dep., p. 19.) While in Salt Lake City, the family stayed together in a rental hotel. (Sands dep., p. 19, 21.) Unfortunately, Salt Lake City was not suited to Roy Varble's allergies and the family only stayed in Salt Lake City for "a couple of weeks." (Sands dep., pp. 19, 21.) The family then left Salt Lake City and headed for Mexico,

via Texas. (Sands dep., pp. 16, 19, 21.) The family was traveling through Texas when the accident occurred. (Sands dep., p. 19; Complaint, ¶6; Answer of Roy Varble, ¶5.)

On the day of the accident, Phyllis Varble, Roy Varble, Randall Sands, and Nellie Carraway (Phyllis Varble's sister) were traveling together to Ajijic, Mexico with the intent to live together in a retirement community on or near Lake Chapala. (Sands dep., pp. 16, 21.) They had all of their belongings with them. (Sands dep., p. 36.) This was not a new living arrangement, as Phyllis Varble, Roy Varble, Randall Sands, and Nellie Carraway had lived together in the same house or living space since 2005. (Sands dep., 5.)

## THE AUTOMOBILE POLICY

On or about November 16, 2008, Auto-Owners Insurance Company issued to Roy Varble and Phyllis Varble an Automobile Policy, Policy Number 43-668-983-00 effective beginning on November 16, 2008, and ending May 16, 2009. (Complaint, ¶21 and Exhibit A; Answer of Roy Varble, ¶10.) The insurance coverage provided to the Varbles under the Policy was subject to the provisions, terms, conditions, exclusions and endorsements of the Policy. (Complaint, ¶22; Answer of Roy Varble, ¶10.) (A Certified Copy of the Insurance Policy was produced as Exhibit A to Auto-Owners' Complaint for Declaratory Relief.)

The Policy issued to the Varbles insured a 2007 Chevrolet Uplander LT, Vehicle Identification Number 1GNDV33117D165462. (Complaint, ¶26 and Exhibit A; Answer of Roy Varble, ¶10.) The 2003 Ford Ranger (owned by Randall Sands) that Phyllis Varble was driving at the time of the accident was **not** a scheduled auto on the Declarations Page of the Policy issued to the Varbles by Auto-Owners. (Sands dep., pp. 10-11; Complaint, ¶27 and Exhibit A; Answer of Roy Varble, ¶10.) The Policy had uninsured and underinsured motorist bodily injury policy limits of $100,000.00 per person and $300,000.00 per occurrence. (Complaint, ¶24, ¶25

4

and Exhibit A; Answer of Roy Varble, ¶10.)

In pertinent part, the Policy contained the following provisions related to uninsured and underinsured motorist coverage:

### INSURING AGREEMENT

The attached Declarations described the **automobile(s) we** insure and the Coverages and Limits of Liability for which **you** have paid a premium. **We** agree to insure the described **automobile(s)** for those Coverages and Limits of Liability subject to the terms and conditions of this policy. In return **you** must pay the premium and comply with all the terms and conditions of this policy.

### SECTION 1 – DEFINITIONS

To understand this policy, **you** must understand the meaning of the following words. These words appear in **bold face type** whenever used in this policy and endorsements attached to this policy.

1. **Automobile** means a **private passenger automobile**, a truck, truck tractor, **trailer, farm implement** or other land motor vehicle.
2. **Bodily injury** means physical injury, sickness or disease sustained by a person including resulting death of that person.

   ...
6. **Occurrence** means an accident that results in **bodily injury** or **property damage** and includes, as one **occurrence**, all continuous or repeated exposure to substantially the same generally harmful conditions.
7. **Private passenger automobile** means:

   ...
   b. pickup or van type **automobile** with a gross weight of 15,000 pounds or less which is not used in the business of carrying passengers for hire; or

   ...
9. **Relative** means a person who resides with **you** and who is related to **you** by blood, marriage or adoption. **Relative** includes a ward or foster child who resides with **you.**

   ...
12. **You** or **your** means the first named **insured** shown in the Declarations and if an individual, **your** spouse who resides in the same household.
13. **Your automobile** means the **automobile** described in the Declarations.

5

# Kentucky
## NON-STACKED UNINSURED MOTORIST COVERAGE
### Automobile Policy

It is agreed:

**1. DEFINITIONS**

The following definitions apply in addition to those contained in **SECTION 1 – DEFINITIONS** of the policy.

...

    **b.** **Uninsured automobile** means an **automobile:**

        **(1)** to which no **bodily injury** liability bond or liability insurance policy applies:

            **(a)** at the time of the **occurrence;**

            **(b)** in at least the minimum amounts required by the Kentucky Motor Vehicle Reparations Act.

    **...**

    **Uninsured automobile** does not include an **automobile:**

        **(1)** owned or leased by, furnished to or available for regular use of **you** or anyone living with **you.**

    ...

        **(6)** that is an underinsured **automobile.** An underinsured **automobile** is an **automobile** to which a **bodily injury** liability bond or liability insurance policy applies at the time of the **occurrence:**

            **(a)** in at least the minimum amounts required by the Financial Responsibility Law in the state where **your automobile** is normally garaged; and

            **(b)** the limits of liability provided are less than the amount of damages the injured person is legally entitled to recover for **bodily injury.**

**...**

**3. EXCLUSIONS**

    Uninsured Motorist Coverage does not apply:

    ...

    **d.** to an underinsured **automobile.**

    **...**

# Kentucky
## NON-STACKED UNDERINSURED MOTORIST COVERAGE
### Automobile Policy

It is agreed:

1. **DEFINITIONS**

    The following definitions apply in addition to those contained in **SECTION 1 – DEFINITIONS** of the policy.

    a. **Occupying** means being in or on an **automobile** as a passenger or operator, or being engaged in the immediate acts of entering, boarding or alighting from an **automobile.**

    b. **Underinsured automobile** means an **automobile** to which a **bodily injury** liability bond or liability insurance policy applies at the time of the **occurrence:**

    (1) in at least the minimum amounts required by the Financial Responsibility Law in the state where **your automobile** is normally garaged; and

    (2) the limits of liability provided are less than the amount of damages the injured person is legally entitled to recover for **bodily injury.**

    **Underinsured automobile** does not include an **automobile:**

    (1) owned or leased by, furnished to or available for regular use of **you** or anyone living with **you**.

    ...

2. **COVERAGE**

    a. **We** will pay compensatory damages, including but not limited to loss of consortium, any person is legally entitled to recover from the owner or operator of an **underinsured automobile** because of **bodily injury** sustained by an injured person while **occupying** an **automobile** that is covered by **SECTION II – LIABILITY COVERAGE** of the policy.

    b. If the first named insured in the Declarations is an individual, this coverage is extended as follows:

    (1) **We** will pay compensatory damages, including but not limited to loss of consortium, **you** are legally entitled to recover from the owner or operator of any **underinsured automobile** because of **bodily injury you** sustain:

    (a) when **you** are not **occupying** an **automobile** that is covered by **SECTION II – LIABILITY COVERAGE** of the policy; or

    (b) when **occupying** an **automobile you** do not own which is not covered by **SECTION II – LIABILITY COVERAGE** of the policy.

7

> ...
> **c.** The **bodily injury** must be accidental and arise out of the ownership, maintenance or use of the **underinsured automobile**.
> ...
>
> **3. EXCLUSIONS**
>
> Underinsured Motorist Coverage does not apply:
>
> **d.** to an uninsured **automobile.**

(Policy – See Complaint, Exhibit A.)

## ARGUMENT

### I.   THE SUMMARY JUDGMENT STANDARD.

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corporation v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548 (1986). The plain language of Rule 56(c) mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Winston v. General Drivers, Warehousemen & Helpers Local Union No. 89, 879 F.Supp. 726, 731 (W.D.Ky. 1995). A court deciding a motion for summary judgment must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 251-252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

As set forth below, no genuine issues of material fact exist in the instant case and Auto-Owners is entitled to judgment as a matter of law.

**I.      ROY VARBLE IS NOT ENTITLED TO UNDERINSURED MOTORIST COVERAGE UNDER THE POLICY.**

In order to recover underinsured motorist coverage under the Policy, Roy Varble must demonstrate that he falls with the coverage granted by the Policy. Roy Varble cannot meet this burden.

Interpretation of an insurance policy is a question of law. K.M.R. v. Foremost Ins. Group, 171 S.W.3d 751, 753 (Ky.App. 2005) (citations omitted). There are two fundamental principles involved insurance contract interpretation: "(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and (2) exceptions and exclusions should be strictly construed to make insurance effective." Id. (citation omitted). Interpreting the contract liberally does not mean the contract should be interpreted in a strained manner. Clear and unambiguous contract terms are interpreted according to their "plain and ordinary meaning." Id., quoting Nationwide Mutual Insurance Company v. Nolan, 10 S.W.3d 129, 32 (Ky. 1999). Unless they have "acquired a technical meaning in law," terms are to be interpreted "according to the usage of the average man and as they would be read and understood by him …." Fryman v. Pilot Life Ins. Co., 704 S.W.2d 205, 206 (Ky. 1986); Nationwide Mut. Fire Ins. Co. v. Creech, 431 F.Supp.2d 710, 716 (E.D.Ky. 2006).

The Policy provides for underinsured motorist coverage as follows:

> **2.     COVERAGE**
> **a.**    **We** will pay compensatory damages, including but not limited to loss of consortium, any person is legally entitled to recover from the owner or operator of an **underinsured automobile** because of **bodily injury** sustained by an injured person while **occupying** an **automobile** that is covered by **SECTION II – LIABILITY COVERAGE** of the policy.

9

      **b.**    If the first named insured in the Declarations is an individual, this coverage is extended as follows:

          **(1)**    **We** will pay compensatory damages, including but not limited to loss of consortium, **you** are legally entitled to recover from the owner or operator of any **underinsured automobile** because of **bodily injury you** sustain:

              **(a)**    when **you** are not **occupying** an **automobile** that is covered by **SECTION II – LIABILITY COVERAGE** of the policy; or

              **(b)**    when **occupying** an **automobile you** do not own which is not covered by **SECTION II – LIABILITY COVERAGE** of the policy.

...

      **c.**    The **bodily injury** must be accidental and arise out of the ownership, maintenance or use of the **underinsured automobile**.

(Policy.)

It is undisputed that, at the time of the accident, Roy Varble was a passenger in the 2003 Ford Ranger. The Ford Ranger was not owned by Roy Varble and it was not a scheduled vehicle under the Policy. Accordingly, the relevant inquiry is whether the 2003 Ford Ranger operated by Phyllis Varble and owned by Randall Sands was an "underinsured automobile" as defined by the Policy. If the Ford Ranger was not an "underinsured automobile," then the Policy affords no underinsured motorist coverage to Roy Varble.

The Policy defines "underinsured automobile" as:

      **b.**    **Underinsured automobile** means an **automobile** to which a **bodily injury** liability bond or liability insurance policy applies at the time of the **occurrence:**

          **(1)**    in at least the minimum amounts required by the Financial Responsibility Law in the state where **your automobile** is normally garaged; and

          **(2)**    the limits of liability provided are less than the amount of damages the injured person is legally entitled to recover for **bodily injury.**

(Policy.)

The underinsured motorist portion of the Policy also contains a regular use exclusion.

10

Specifically, the Policy excludes from the definition of "underinsured automobile" an automobile "owned or leased by, furnished to or available for regular use of **you** or anyone living with **you**." (Policy.) If the regular use exclusion is enforceable and applicable, Roy Varble cannot be entitled to underinsured motorist coverage.

### A. THE REGULAR USE EXCLUSION CONTAINED IN ROY VARBLE'S POLICY IS ENFORCEABLE.

Under Kentucky law, a "regular use" exclusion, such as the exclusion at issue, is enforceable and is not against public policy.

In <u>Murphy v. Kentucky Farm Bureau Mut. Ins. Co.</u>, 116 S.W.3d 500 (Ky.App. 2003), the Kentucky Court of Appeals decided a case involving similar facts to the case at bar. In <u>Murphy</u>, Austin Goodpaster, a minor, was killed in a single-car accident. <u>Id</u>. at 501. Dale Goodpaster, Austin's brother, was driving the vehicle and caused the accident. <u>Id</u>. The vehicle was owned by Austin's mother, Tina Murphy. <u>Id</u>. Austin lived in the same household with Tina Murphy, Brian Murphy (step-father), and Shannon Goodpaster (sister). <u>Id</u>. Both Brian and Shannon owned vehicles that were insured with Kentucky Farm Bureau. <u>Id</u>.

After collecting the liability limits from Tina Murphy, the vehicle's owner, Austin's estate sought underinsured motorist coverage from Kentucky Farm Bureau on the policies held by Brian and Shannon. <u>Id</u>. Kentucky Farm Bureau denied the claims and relied on the policies' regular use exclusions, which excluded from underinsured motorist coverage any vehicle "owned by or furnished or available for the regular use of you or any family member." <u>Id</u>. Austin's estate admitted that the regular use exclusions were applicable because Tina Murphy, the vehicle's owner, lived in the same household as Austin and because the vehicle was available for the regular use by family members. <u>Id</u>. Despite those facts, Austin's estate urged the Court to hold that the regular use exclusion was against public policy. <u>Id</u>.

11

In analyzing the issue, the Court noted that Kentucky decisions upheld the enforceability of regular use exclusions and found them not to be against public policy. Id. The Court further found that the regular use exclusion was not against public policy because the vehicle's owner—a family/household member—had control over the amount of liability coverage purchased. Id. at 503. Unlike the household exclusion, which was found to be against public policy because it offered less liability coverage to family members than to members of the general public, the regular use exclusion did not affect the vehicle's owner's ability to purchase greater coverage if desired. Id. Because the Kentucky Supreme Court had stated, albeit in dicta, that regular use exclusions were not against public policy, the Murphy Court declined to make a contrary public policy decision and left it to the Kentucky Supreme Court to do so. Id. at 502-502.

In 2008, the Kentucky Supreme Court was presented an opportunity to declare that regular use exclusions in underinsured motorist policies were against public policy. It declined to do so.

The case of Williams v. State Farm Insurance Company, 255 S.W.3d 913 (Ky. 2008) involved a single-vehicle accident that resulted in the deaths of two brothers. Id. at 914. The driver was operating a vehicle he owned and insured. Id. The passenger was listed as a driver on his parents' policy. Id. After recovering the driver's liability policy limits, passenger's estate sought underinsured motorist coverage from his parents' policy. Id.

State Farm denied the underinsured motorist coverage claim based on a policy exclusion which stated that underinsured coverage did not apply where the injury occurred in a vehicle "[f]urnished for the regular use of you, your spouse or any relative." Id. "'Relative' was defined in the policy as being a person related to the policy holder(s) who primarily resided with them,

12

including unemancipated children." Id. The Court found that the driver, a minor living with his parents, was a "relative" of the parents under the terms of the policy. Id.

State Farm moved for summary judgment based on the regular use exclusion, arguing that a vehicle owned by the driver was a vehicle "furnished for the regular use" of the driver. Id. The Kentucky Court of Appeals affirmed the trial court in a 2-1 decision. Id. The Kentucky Supreme Court granted review on this issue of whether a vehicle owned by a relative was a vehicle "furnished" to a relative. Id at 915. In deciding the issue, the Kentucky Supreme Court, citing Hortman v. State Farm Mut. Ins. Co., 823 So.2d 1048, 1052 (La.Ct.App. 2002), held that a vehicle owned by the driver was not "furnished" by the parents for the driver's use. Id. Accordingly, the exclusion did not apply to any vehicle *owned by* a relative. Id.

In its opinion, the Williams Court mentioned the Court of Appeals decision in Murphy. Id. at 915. The Court noted that the regular use exclusion in Murphy contained the phrase "owned by," thereby distinguishing it from the regular use exclusion in Williams. Id. More importantly, the Williams Court specifically mentioned that, "The issue in Murphy was whether this regular-use exclusion was against public policy. The court held it was not." Id. The Williams Court did not overrule Murphy, and did not hold that regular use exclusions in underinsured motorist policies were against public policy. Instead, the Williams Court decided the matter before it by examining the specific policy language of the policy at issue. By not declaring the regular use exclusion to be against public policy and by examining the differences between varying policies, the Kentucky Supreme Court has made it clear that regular use exclusions in underinsured motorist policies are enforceable and are not against public policy.

**B.     THE VEHICLE INVOLVED IN THE ACCIDENT WAS OWNED BY AND/OR AVAILABLE FOR THE REGULAR USE OF PERSONS LIVING WITH ROY VARBLE.**

As detailed below, the evidence of record confirms the following: 1) the Ford Ranger was owned by Randall Sands; 2) the Ford Ranger was available for the regular use of Phyllis Varble; and 3) Roy Varble, Phyllis Varble, and Randall Sands lived together on the day of the accident. These conclusions trigger the operation of the regular use exclusion contained in the Policy.

### *1.     The Ford Ranger Was Owned By Randall Sands.*

It is undisputed that Randall Sands owned the Ford Ranger on the day of the accident. Auto-Owners alleged that Randall Sands owned the Ford Ranger in its Complaint and Roy Varble admitted the allegation in his Answer. (Complaint, ¶11; Answer of Roy Varble, ¶5.) Moreover, Randall Sands testified in deposition that, on the day of the accident, he owned the Ford Ranger, that title to the Ford Ranger was solely in his name, and that he had procured insurance on the Ford Ranger. (Sands dep., pp. 10-11, 12, 13.) The record contains no evidence calling into doubt Randall Sands' ownership of the vehicle.

### *2.     The Ford Ranger Was Available for The Regular Use of Phyllis Varble.*

In Kentucky Farm Bureau Mut. Ins. Co. v. Cook, 590 S.W.2d 885, 890 (Ky. App. 1978) *reversed in part by* Kentucky Farm Bureau Mut. Ins. Co. v. Cook, 590 S.W.2d 875 (Ky. 1979), the Kentucky Court of Appeals upheld the trial court's use of jury instructions defining the phrase "available for regular use" as "that thing to which it refers can usually and regularly be had or be used whenever it is wanted, needed or desired and that such use may be made without seeking permission of the owner for each such use." The fact that a driver does not need to obtain the owner's permission before using the vehicle is particularly relevant to this inquiry. Kentucky Farm Bureau Mut. Ins. Co. v. Hill, 278 S.W.2d 729, 731 (Ky. 1955).

14

Phyllis Varble was the co-owner of the Ford Ranger less than one year before the accident. Randall Sands testified that Phyllis Varble could use the Ford Ranger whenever she wanted and needed to and that she did not need his permission to do so. He expressed no concern over Phyllis Varble's use of the vehicle, and testified that she drove the Ford Ranger on occasion. Randall Sands' lack of concern is further evidenced by his willingness to allow Phyllis Varble to drive the Ford Ranger from Salt Lake City, Utah to Ajijic, Mexico. These facts demonstrate that the Ford Ranger could usually and regularly be had or be used by Phyllis Varble whenever it was wanted, needed or desired and that Phyllis Varble's use of the Ford Ranger was made without seeking permission of Randall Sands for each such use. The inescapable conclusion is that the Ford Ranger was available for Phyllis Varble's regular use.

### 3. *Roy Varble, Phyllis Varble, And Randall Sands Lived Together On The Day Of The Accident.*

The Policy excludes from the definition of "underinsured automobile" a vehicle "owned … by … or available for the regular use of" Roy Varble or anyone "living with" Roy Varble. (Policy.) Two definitions of the verb "live" are "to occupy a home: dwell" and "cohabit." (www.merriam-webster.com). Abide, dwell, and reside are synonymous with "live." Id. Dwell means "to live as a resident." Id. A resident is "one who resides in a place." Id. Accordingly, persons who "live with" Roy Varble are persons who reside or dwell with Roy Varble.

The seminal Kentucky case on the issue of whether family members are living together for the purposes of determining insurance coverage is Perry v. Motorists Mut. Ins. Co., 860 S.W.2d 762 (Ky. 1993). In Perry, a young couple was killed in an automobile accident on their wedding day. Id. at 764. The wife's father filed suit for underinsured motorist benefits on behalf of the wife's estate arguing that, at the time of her death, the wife was a resident of his household. Id. The undisputed facts indicated that the wife lived with her father until three to

four weeks before the marriage. Id. During that time, the wife stayed in the home of her husband's aunt, despite the fact that she originally intended to stay only one night at the aunt's house. Id. While staying with the aunt, the wife occasionally returned to her father's house to gather belongings and, in fact 90 percent of her belongings remained in his house. Id. The wife retained a key to her father's house and continued to use his address as her mailing address. Id. At the time of their deaths, the couple had not settled their post-marriage living arrangements. Id.

On these facts, the jury found that the wife was a resident of her father's household under the policy. The Court of Appeals, finding that the issue of the wife's residence was a question of law, reversed the jury's verdict and the Kentucky Supreme Court granted review. Id.

In discussing the issue of residency, the Kentucky Supreme Court held that "[r]esidency and intent are questions of fact and not of law where the evidence supports more than one inference upon which reasonable minds may differ." Id. According to the Court, "legal residency is based on fact and intention." Id. citing Ellison v. Smoots, Admr., 151 S.W.2d 1017 (Ky. 1941). Each case must be resolved on its own set of facts and "[w]hether a new residence has been acquired or an old residence abandoned is dependent on the totality of all facts and circumstances." Id. citing Burr's Admr. v. Hatter, 43 S.W.2d 26 (Ky. 1931) and 28 C.J.S. Domicile § 19 (1941).

Ultimately, the Kentucky Supreme Court held that although Kentucky law permits the question of intent to be decided as a matter of law, such is not the case where more than one reasonable inference can be drawn from the testimony regarding a person's intent. Id. at 765. According to the Court, the evidence related to the wife's intent to abandon her father's residence and whether she developed the intent to establish a new residence were subject to

16

several interpretations. Id. Accordingly, the conclusions to be drawn from the evidence were factual determinations to be made by the jury. Id. The Kentucky Supreme Court reinstated the jury's original verdict. Id. See also, Hammons v. Ohio Cas. Ins. Co., 2009 WL 1505548, 6 (E.D.Ky. 2009) and Allstate Indem. Co. v. Shoopman, 2010 WL 567981, 2 (E.D.Ky. 2010) (both holding that under Kentucky law residence is an issue to be decided by a jury when the evidence supports more than one reasonable inference; therefore, summary judgment is inappropriate).

Under the Kentucky authorities cited above, if the facts surrounding a person's residence and intent are undisputed and only one inference can be made from the undisputed facts, the question of a person's residence may be decided as a matter of law. In this case, only one conclusion can be reached from the evidence of record—that both Randall Sands and Phyllis Varble lived with Roy Varble.

The testimony of Randall Sands regarding his living arrangements, and the living arrangements of Roy and Phyllis Varble, is undisputed. According to Randall Sands, he had lived in the same house or living space with Roy Varble, Phyllis Varble, and Nellie Carraway beginning in 2005. The family first moved in together at 2613 South Cherokee, Owensboro, Kentucky. Then, in 2008, the family moved to 67 Paddock Street, Montgomery, Illinois. Before the accident, the entire family packed up their belongings with the intent to move, together, to Ajijic, Mexico, where they would live together in a retirement community. During this trip, the family made a stop in Salt Lake City, Utah, where they lived, together, for a couple of weeks in a rental hotel.

Based on Randall Sands' undisputed testimony, it is abundantly clear that Roy Varble, Phyllis Varble, Randall Sands, and Nellie Carraway lived together continuously from 2005 and that they intended to continue doing so until the accident intervened.

### C. ROY VARBLE WAS NOT A PASSENGER IN AN UNDERINSURED AUTOMOBILE

The Policy unambiguously states that Auto-Owners will "pay compensatory damages … any person is legally entitled to recover from the owner or operator of an **underinsured automobile**." The Policy also unambiguously excludes from the definition of an "underinsured automobile" an automobile "owned or leased by, furnished to or available for regular use of [Roy Varble] or anyone living with [Roy Varble]."

The record is clear that the Ford Ranger was owned by Randall Sands, a person living with Roy Varble. This fact, alone, is sufficient to exclude the Ford Ranger from the Policy's definition of underinsured automobile. Moreover, the Ford Ranger was available for the regular use of either Randall Sands or Phyllis Varble, both persons living with Roy Varble. This, alone, is also sufficient to exclude the Ford Ranger from the definition of underinsured automobile. Because any bodily injury sustained by Roy Varble did not "arise out of the ownership, maintenance or use of [an] underinsured automobile," no underinsured motorist coverage is owed to Roy Varble. Auto-Owners is entitled to the entry of judgment in its favor declaring that Auto-Owners owes no underinsured motorist coverage to Roy Varble.

## II. ROY VARBLE IS NOT ENTITLED TO UNINSURED MOTORIST COVERAGE UNDER THE POLICY.

Roy Varble, via his Guardian, Edward H. Varble, filed an Answer to Auto-Owners' Complaint on March 2, 2010. Paragraph 13 of the Answer states, "The Guardian for Roy Varble is not making a claim for uninsured coverage under Paragraph 31 on the Auto-Owners Policy since Progressive had the primary coverage for the damages suffered by Roy Varble." In light of this admission, Auto-Owners is entitled to a judgment in its favor declaring that it owes no uninsured motorist coverage to Roy Varble.

## CONCLUSION

For the reasons set forth above, Auto-Owners is entitled to the entry of a judgment in its favor declaring that, under the terms of the Automobile Policy, Policy Number 43-668-983-00 effective beginning on November 16, 2008, and ending May 16, 2009, issued to Roy Varble, it owes no underinsured motorist coverage and no underinsured motorist coverage to Roy Varble for any claims arising out of the automobile accident of January 7, 2009.

Respectfully submitted,

/s/ David K. Barnes_____
David K. Barnes
SCHILLER OSBOURN BARNES & MALONEY, PLLC
1600 One Riverfront Plaza
401 W. Main Street
Louisville, KY 40202
T: (502) 583-4777
F: (502) 583-4780
Counsel for Plaintiff, Auto-Owners Insurance Company

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of December, I electronically filed the foregoing with the clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Russell L. Wilkey  FCWilkey@wilkeylaw.com
Counsel for the Estate of Phyllis Varble

E. Louis Johnson  eljky1@bellsouth.net
Counsel for Edward H. Varble,
Guardian for Roy Edward Varble, Jr.

/s/ David K. Barnes
David K. Barnes
SCHILLER OSBOURN BARNES & MALONEY, PLLC
401 W. Main Street, Suite 1600
Louisville, KY  40202
T: (502) 583-4777
F: (502) 583-4780
dbarnes@sobmlegal.com
Counsel for Plaintiff, Auto-Owners Insurance Company